UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STARR INDEMNITY & LIABILITY COMPANY and NEW YORK MARINE & GENERAL INSURANCE CO., | ) ) ) ) | |
| Plaintiffs and Counter-Defendants, | ) ) | |
| vs. | ) ) | Case No. 4:11CV809 JAR |
| CONTINENTAL CEMENT COMPANY, L.L.C., SUMMIT MATERIALS, L.L.C., and THE UNITED STATES ARMY CORPS OF ENGINEERS, | ) ) ) ) ) | |
| Defendants and Counter-Plaintiffs. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on several motions. First, there are three <u>Daubert</u> motions. Defendants/Counterclaim-Plaintiffs Continental Cement Company, L.L.C. and Summit Materials, L.L.C.'s (collectively, "Continental") filed a Motion to Exclude Expert Opinions and Computer-Based Modeling of William Manley (ECF No. 101). Plaintiffs/Counterclaim-Defendants Starr Indemnity & Liability Company and New York Marine & General Insurance Company's (collectively, "Starr") filed a <u>Daubert</u> Motion to Exclude John Tylawsky (ECF No. 103) and a <u>Daubert</u> Motion to Exclude Tom Rollins (ECF No. 109).

The parties also filed several summary judgment motions. Continental filed a Motion for Partial Summary Judgment that "Due Diligence" is Not a Defense to Coverage Under the Perils Clause of the Hull Policy (ECF No. 87), a Motion for Partial Summary Judgment on Wreck Removal (ECF No. 97), a Motion for Partial Summary Judgment on Starr's Contention and

Affirmative Defenses that the Policies are Void (ECF No. 99).   Starr filed a Motion for Partial

Summary Judgment (ECF No. 107).   Starr also filed a Motion to Exclude Corps' Witnesses and

Letter (ECF No. 104).

These motions are fully briefed and ready for disposition.

## I.    BACKGROUND

This case involves liability and indemnity under insurance contracts regarding the sinking

of the Mark Twain and the wreck removal of the Mark Twain.   The Mark Twain, built in 1926, is

a cement carrying barge that sank in the Mississippi River at Continental's dock in St. Louis,

Missouri on the morning of February 7, 2011.   The Mark Twain barge sank near the right

descending bank of the Mississippi River, approximately at river mile 181.2, close to the new

Mississippi River bridge that is under construction.

This case involves both a first party property insurance claim for the hull value of the

sunken Mark Twain and a third party protection and indemnity ("P&I") insurance claim for wreck

removal coverage.   On November 4, 2010, Continental applied to Starr for marine insurance for

its five barges, including the Mark Twain.   Starr approved Continental's insurance application

and sold Continental a primary marine insurance contract (Policy No. MASIHBN00006910)(the

"Primary    Insurance    Contract")    and    a    form    excess    policy    (Policy    No.

MASILBN00035910)("Excess Insurance Contract").

The pertinent part of the hull policy provides insurance:

Touching the adventures and perils ... of the waters named herein, fire, lightening,
earthquake, assailing thieves, jettisons, barratry of the master and mariners and all
other like perils that shall come to the hurt, detriment or damage of the vessel
named herein.
***
This insurance also covers loss of or damage to the vessel named herein directly
caused by:

Accidents in loading, discharging or handling cargo, or in bunkering;

Accidents in going on or off, or while on dry docks, graving docks, ways, marine railways, gridirons or pontoons;

Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakages of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing the defective part);

Breakdown of or accidents to nuclear installations or reactors not on board the vessel named herein;

Contact with aircraft, rockets or other similar missiles, or with any land conveyance;

Negligence of charterers and/or repairers, provided such charterers and/or repairers are not assured(s) hereunder;

Negligence of master, mariners, engineers or pilots;

provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them.

(ECF No. 1-4, pp. 1-2).

In Carolyn O'Connor's May 9, 2011 letter, Starr, through its claims' agent, Vericlaim, declined coverage under both portions of the policy. With respect to hull coverage, Vericlaim stated, in pertinent part:

Although we have requested that you identify a particular peril covered by the policy that caused the barge to sink, we have yet to receive any indication from you of which particular peril might arguably cover this loss. Moreover, our own investigation fails to reveal that the barge sank due to any peril enumerated in the insurance policy. To the contrary, the loss appears to have been due to a lack of due diligence by the assureds.

(ECF No. 1-4, p. 2).

In turn, the operative part of the indemnity policy for salvage and wreck removal provides indemnity for covered losses, as follows:

(6) Cost or expense of, or incidental to, any attempted or actual removal or disposal of obstructions, wrecks or their cargoes under statutory power or otherwise pursuant to law, PROVIDED, however, that there shall be deducted from such

claim for cost or expenses, the value of any salvage from the wreck inuring to the benefit of the Assured or any subrogee thereof.

(ECF No. 1-4, p. 2).

The Protection and Indemnity portion of the policy further provides:

EXCLUSIONS

Notwithstanding anything to the contrary elsewhere herein the Underwriters will not indemnify the Assured in respect of any of the following matters:

(I)     Salvage charges, special charges, general average, freight detention, demurrages or loss of use, of the Vessel.

(ECF No. 1-4, p. 2).

In its May 9, 2011 letter, Vericlaim likewise declined indemnity for salvage or wreck removal based upon the following:

We are unaware ... of a governmental order or other requirement for removing the sunken barge.  Moreover, given its location between your company's dock and the shore, reasonable apprehension of civil or criminal liability for pollution, collisions, and other serious incident, even if covered by the policy, seems unlikely, and removal is therefore unwarranted.  For these reasons, the removal of the MARK TWAIN does not fall within the provisions providing coverage for the removal of a wreck, but would instead be a salvage operation for which the Policy provides no coverage.

(ECF No. 1-4, p. 2).

On that same day (May 9, 2011), Starr filed this action seeking a declaration of its rights and obligations under the insurance contracts.  (ECF No. 1).  On August 14, 2012, Starr filed a Fourth Amended Complaint (ECF No. 76) asking for declaratory judgment that (1) the sinking of the Mark Twain was not caused by a named peril as required by the Policy; (2) Continental['s] failure to exercise due diligence resulted in the sinking of the Mark Twain as required by the

Policy; (3) any removal of the Mark Twain would be an uncovered salvage operation because it is not compelled by law as required by the Policy; (4) Continental's breach of the duty of utmost fidelity it owed to Starr voids both the Policy and the Excess Policy; and (5) Continental's breach of its warranty of seaworthiness voids both the Policy and the Excess Policy.

(ECF No. 76, p. 10).

On August 30, 2012, Continental filed its Answer to the Fourth Amended Complaint and Counterclaim. (ECF No. 79). In the Counterclaim, Continental alleges a claim for breach of contract and asks for (a) the cost of wreck removal of the Mark Twain, (b) the agreed hull value of the Mark Twain, (c) consequential and incidental damages, (d) damages, reasonable attorney's fees and other relief for vexatious and unreasonable refusal to pay covered insurance claims; and (e) any other relief. (Id., pp. 15-16).

## II.    **DAUBERT MOTIONS**

### A.    **Legal Standard**

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

See Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted). In Daubert, the Supreme Court explained that in examining an expert's opinions for admissibility, trial courts should consider the following criteria: (1) whether

the theory being offered by the expert has been tested; (2) whether the theory has been subjected to peer review, publication, or analysis by others considered experts in the field; (3) whether the theory has a "known or potential rate of error"; and (4) whether the theory has been generally accepted by others in the field.   Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94, 113 S. Ct. 2786, 2796-97 (1993).   "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."   Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citing Daubert, 509 U.S. at 592, 113 S. Ct. at 2796).   "'The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury.'" Sappington v. Skyjack, Inc., 512 F.3d 440, 448 (8th Cir. 2008) (quoting Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997)).

   **B.     Continental's Motion to Exclude William Manley (ECF No. 101)**

                1.     Manley's opinions regarding whether wreck removal of the Mark Twain is "under statutory power or otherwise pursuant to law"

Manley believes that the Mark Twain sank as a result of a slow leak.   Manley's report analyzes the ten factors enumerated in 33 C.F.R. §245.20, a regulation concerning factors the United States Army Corps of Engineers ("the Corps") considers when determining whether a wreck must be removed, and asserts that each factor supports his conclusion that the Corps should not require removal of the barge or that Continental could obtain a permit to keep the barge at the bottom of the river.

Continental contends that Manley provides legal argument, not opinion testimony.   The Eighth Circuit has held that interpretation of federal law is not an appropriate subject for expert testimony.   See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003)("expert testimony on legal matters is not admissible");   Russell v. Burlington Ins.

Co., CIV.09-431RHK/JJK, 2009 WL 5873000, at *1 (D. Minn. July 7, 2009)("The interpretation of an insurance policy, however, is a question of law for the Court."). Further, Continental contends that Manley's opinions are mere speculation on his part that does not aid the jury.

Starr claims that Manley's testimony relates to whether a sunken vessel must be removed under the Wreck Act. (ECF No. 118, p. 13 (citing 33 C.F.R. §425.20)). Starr asserts that Manley's testimony is based upon his experience preparing permits and having them approved. Starr contends that Manley simply provides testimony regarding the location of the navigation channel, the current flow in the area where the barge sank, the type of river traffic in that area from which the jury will be able to assess the criteria the law requires the jury to apply.

The Court finds this issue is moot, given its discussion regarding liability for wreck removal. The Court has decided that Starr should indemnify Continental for the cost of wreck removal, unless one of Starr's defenses applies. Accordingly, Manley's testimony regarding whether the wreck must be removed is irrelevant as the Court has decided this issue as a matter of law.

> 2.     Manley's proposed expert testimony regarding his computer-based "ship stability" analysis

Starr offers Manley's testimony in support of the denial of Continental's hull claim, which relates to the cause and manner of the sinking. At his initial deposition, Manley testified that he conducted a computer-based "ship stability" analysis to show how the barge sank. Manley conducted his analysis and modeling using an Excel spreadsheet. Manley input a variety of numbers into the Excel spreadsheet to achieve a modeling input that mirrored the positioning of the Mark Twain. Manley admits that his computer analysis does not follow the U.S. Coast Guard's Marine Safety Guidelines for reviewing barge stability.

On October 4, 2012, 2 months after his initial deposition, Manley produced an Addendum Expert Report that included a "Stability Review" consisting of a spreadsheet and related computer modeling ("Iteration 5"). Iteration 5 concluded that the Mark Twain sank over 36 hours and yields a water flow rate of 15.62 gallons/minute.

On November 30, 2012, Manley produced a second "Stability Review" ("Iteration 6"). In Iteration 6, Manley opines that the Mark Twain may have sank over a period of 2 months, with a flow rate of .4 gallon/minute.

Continental contends that Manley's methodology does not satisfy <u>Daubert</u> because it cannot be tested and has not been subject to peer review. Continental states that Manley ignored accepted guidelines for reviewing barge stability, the Marine Safety Center Guidelines. Continental claims that the calculations are rife with error, and that Manley simply inserted numbers in an effort to obtain the desired result, without consideration of the actual conditions at the time the Mark Twain sank.

In response, Starr asserts that Manley's methodology can be tested because it involves accepted mathematical principles. Starr maintains that the Excel spreadsheets simply perform the mathematical calculations in an expedited manner; all of the calculations can be done by hand and be replicated. Starr states that production of Manley's Excel template is unnecessary because the calculations can be done by hand. Starr further claims that the Marine Safety Center Guidelines are not applicable to uninspected vessels such as the Mark Twain. Finally, Starr argues that Manley's calculations are based upon reliable data regarding the freeboard (the height of a ship's deck above the water level) as stated in the sworn testimony of Continental's own terminal manager and dock worker.

During oral argument on the <u>Daubert</u> motions, Manley agreed to provide his Excel spreadsheet, including the supporting calculations.   Therefore, the Court believes that Continental's argument regarding Manley's failure to provide the calculations that are the basis of his report is moot.   The rest of Continental's argument regarding Manley's testimony relates to the merits of his opinion, particularly the cause of the sinking of the Mark Twain.   The Court finds that such testimony is admissible, particularly given that Continental has provided an expert on the same topic.   While the Court is charged as a "gatekeeper" to exclude unhelpful and unreliable expert testimony, "'[i]t is decidedly the jury's role to evaluate the weight to be given to the testimony of dueling qualified experts.'"   <u>ABT Sys., LLC v. Emerson Elec. Co.</u>, 4:11CV00374 AGF, 2013 WL 490174, at *1 (E.D. Mo. Feb. 8, 2013)(quoting <u>Uniloc ESA, Inc. v. Microsoft Corp.</u>, 632 F.3d 1292, 1306 (Fed.Cir.2011)).   Given that Continental does not take issue with the qualifications of Manley to provide testimony regarding the cause of the sinking of the Mark Twain, the Court finds that his opinions are relevant to the issues at hand and would be helpful to the jury in deciding the obligations under the insurance contract.   Any concerns the Court has regarding the merits of his opinion are more properly addressed during his cross-examination and examination of Mr. Tylawsky.

### C.      Starr's Motion to Exclude John Tylawsky (ECF No. 103)

In his report, Tylawsky asserts that ice and/or drift punctured the barge around the starboard #3 wingtank at or near the bottom of the barge, causing it to sink.   He claims that he saw a "pressure pulse" when the diver removed the compressor hose and attachments from that wingtank at the end of the last day of dive inspections.   No drift hole has been identified.

Starr claims that Tylawsky's theory is not tested and is unsupported by the facts or generally accepted principles of science and engineering.   Starr asserts that Tylawsky was unable

to fully pressurize the starboard #3 wingtank because air leaked into other compartments. Starr also claims that Tylawsky's theory fails to satisfy the requirements of <u>Daubert</u> because it has not undergone publication or peer review, and it has not been duplicated. Starr states that Tylawsky's purported peer review with an engineering colleague, John Zseleczky, is insufficient. In fact, Starr asserts that Tylawsky's discussion with Zseleczky only demonstrates that Tylawsky is not an expert in this area; Zseleczky had to give Tylawsky a class outline for a class Zseleczky teaches on this subject. Finally, Starr contends that Tylawsky improperly ruled out other theories, such as Manley's "slow leak" theory.

In response, Continental claims that Tylawsky's report satisfies the requirements under <u>Daubert</u>. Continental notes that Tylawsky conducted experiments on the barge itself, as opposed to models as Starr's expert, Manley, did. Continental contends that Tylawsky observed a pressure plus (otherwise referred to as a "waterhammer effect"), which is based upon the Bernoulli Principle. Continental maintains that Tylawsky's engineering analysis explains why all of the other wing tanks pressurized similarly except for the starboard #3 wing tank and confirms his theory about why the barge sank. Continental argues that Starr's case law is not on point because those cases involved experts that never tested their theories, whereas Tylawsky tested his theory on the Mark Twain. Continental further claims that Tylawsky satisfied the peer review requirement by consulting with Zseleczky, who confirmed the pressure pulse. Finally, Continental asserts that pressurizing wing tanks is a scientifically acceptable experiment and Tylawsky's calculations have a known rate of error.

On review, it seems that Starr takes issue with Tylawsky's theory and results, rather than his methodology. Neither party disputes that Tylawsky's method of pressurizing the wingtanks is an acceptable method. The parties only disagree regarding whether Tylawsky's observations

regarding the same support or detract from his theory. The Court believes that any concerns that Starr has regarding Tylawsky's theory can be addressed on cross-examination or with Manley. See ABT Sys., LLC, 2013 WL 490174, at *1. Therefore, the Court denies Starr's Motion to Exclude John Tylawsky.

### D. Plaintiffs' Daubert Motion to Exclude Tom Rollins (ECF No. 109)

Starr states that Continental retained retired insurance broker Tom Rollins to interpret the policy, provide opinions about coverage, and identify ways in which Starr violated its duties under the policy or under Missouri insurance law. (ECF No. 109, ¶4). Starr claims that Rollins' opinions are inadmissible because they require Rollins to interpret the policy or the law to arrive at his position. (ECF No. 109, ¶6). Starr contends that Rollins' opinions are based on nothing more than his experience handling claims and selling insurance, and they are not reliable and will not aid a jury. (ECF No. 109, ¶9). Starr argues that Rollins cannot state that Starr is belatedly latching on to the 2008 feasibility study to divert attention from its own mistakes, *i.e.*, its declination without an adequate investigation.

In response, Continental claims that Rollins' opinions are based upon facts and expertise, and Starr misstates several of Rollins' opinions. For example, Continental points out that Rollins opines that feasibility studies are not typically provided to underwriters/insurers--not that Starr violated the doctrine of *uberrimae fidelis*. And, Continental notes that Rollins opines that Starr declined coverage without an adequate investigation--not that Starr breached its legal obligations by denying coverage before a full investigation. Continental contends that, given Rollins' experience and expertise, Rollins is within his province as an expert to offer the opinion that Starr belatedly seized upon the 2008 feasibility study in an effort to divert attention from its own mishandling of (1) the underwriting, (2) the Mark Twain claims investigation, and (3) Starr's

declination.  (ECF No. 114, pp. 13-14).  Continental asserts Rollins can also testify as an insurance expert regarding Starr's (1) unresponsiveness and (2) failure to raise coverage issues until Manley's hefty wreck removal estimate and emails regarding the need for a significant reserve, which indicate a failure to satisfy insurance industry standards and reasonable claims handling.  (ECF No. 114, p. 14).  Continental maintains that Rollins can also testify that Starr acted unreasonably in denying coverage for wreck removal based upon the fact that (1) Corps demanded that Continental remove the barge, (2) Coast Guard Notices to Mariners warning vessel operators that the sunken Mark Twain threatens navigation, and (3) photographs showing mariners probing the wreck in order to avoid hitting it.  (ECF No. 114, p. 14).  Continental argues that Rollins also can testify that it is troubling and inconsistent that Starr sued the Corps after it decline coverage because an insurance company has no further contractual obligation to its insured. (ECF No. 114, pp. 14-15).

The Court first finds that Rollins is qualified as an expert.  He has extensive experience in the insurance industry and can testify regarding industry practices and protocol.  Generally, the Court finds that Tom Rollins' proposed testimony is proper for expert testimony, however, there are instances where his expert report invades the province of the jury.  See S. Pine Helicopters, Inc., 320 F.3d at 841 (8th Cir. 2003).  Mr. Rollins can testify regarding typical insurance and maritime industry practices. The Court only cautions Mr. Rollins not to extend his testimony into legal conclusions.  For example, Mr. Rollins can testify regarding what are typical industry practices but he cannot extend his testimony to legal conclusions such as that Starr's "insurance policies *do* provide coverage for removal of the Mark Twain wreck" and that "Starr's insurance policy also provides hull coverage for the loss of the Mark Twain."  If the parties have any doubt regarding whether a line of questioning will invade the province of the jury, they shall consult with

the Court at sidebar. The Court denies Starr's motion to exclude Tom Rollins but limits Mr. Rollins' testimony as discussed above.

## III.  SUMMARY JUDGMENT MOTIONS

### A.  Continental's Motion for Partial Summary Judgment that "Due Diligence" is Not a Defense to Coverage Under the Perils Clause of the Hull Policy (ECF No. 87)

Starr's Complaint alleges that Continental's "failure to exercise due diligence" excludes coverage under the hull policy, and Starr stated in its answer to Continental's counterclaim that Continental's failure to exercise due diligence excludes coverage.   (Answer, ¶30).

In its Motion for Summary Judgment, Continental argues that the "want of due diligence" is only an exclusion to the Inchmaree Clause, one basis for coverage, and not an exclusion under the Perils Clause, the other basis for which Continental seeks coverage.   Continental moves for summary judgment on the basis that its alleged lack of due diligence is not a defense to coverage.

The Perils Clause of the hull coverage policy pertains to the following:

Touching the adventures and perils ... of the waters named herein, fire, lightening, earthquake, assailing thieves, jettisons, barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein.

The Inchmaree Clause of the hull policy pertains to the following:

This insurance also covers loss of or damage to the vessel named herein directly caused by:

Accidents in loading, discharging or handling cargo, or in bunkering;
Accidents in going on or off, or while on dry docks, graving docks, ways, marine railways, gridirons or pontoons;
Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakages of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or

13

repairing the defective part);
Breakdown of or accidents to nuclear installations or reactors not on board the vessel named herein;
Contact with aircraft, rockets or other similar missiles, or with any land conveyance;
Negligence of charterers and/or repairers, provided such charterers and/or repairers are not assured(s) hereunder;
Negligence of master, mariners, engineers or pilots;
provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them.

Continental argues that because the Perils Clause does not contain an exclusion for the "want of due diligence" then lack of "due diligence" cannot be a defense to coverage under the Perils Clause of the Hull Policy. Rather, Continental claims that, under the plain language of the policy, the "due diligence" defense is limited to the Inchmaree Clause.

Both parties admit that the plain language of the Perils Clause does not include an exclusion for lack of due diligence. See, e.g., ECF No. 88, p. 4; ECF No. 96, p. 2 (noting that the Perils Clause does not explicitly specify that due diligence is required). Starr, however, contends that every hull policy contains an implicit obligation by its owners to exercise due diligence to maintain the barge in a seaworthy condition. (ECF No. 96, p. 2). Starr argues that "American maritime law implies into every time hull insurance policy a warranty of seaworthiness." L & L Marine Service, Inc. v. Insurance Co. of North America, 796 F.2d 1032, 1035 (8th Cir. 1986). The Eighth Circuit stated that every hull policy has two warranties: "The first is an absolute warranty by the assured that a vessel is seaworthy at the time that the insurance policy attaches. The second, which relates to defects of seaworthiness which arise after commencement of the risk, is a 'negative, modified warranty, * * that the Owner, from bad faith or neglect, will not knowingly

14

permit the vessel to break ground in an unseaworthy condition.'" Id. (citing Saskatchewan Government Ins. Office v. Spot Pack, Inc., 242 F.2d 385, 388 (5th Cir. 1957)). Thus, Starr claims that general maritime law applies an obligation of due diligence aside from the due diligence required by the Inchmaree Clause. (ECF No. 96, p. 5).

In reply, Continental again claims that, under basic contract principles, the want of due diligence language in the Perils Clause precludes a due diligence requirement. (ECF No. 111, pp. 2-3). Continental contends that otherwise the "due diligence" language would be superfluous or redundant. (Id., p. 3). In addition, Continental argues that Starr's legal authority, particularly L & L Marine Service, Inc. v. Insurance Co. of North America, does not support implying a due diligence obligation because such policies expressly, not implicitly, excluded losses due to a failure to exercise due diligence. (Id., p. 3).

The Eighth Circuit, however, addressed Continental's concern in a footnote in L & L Marine Service, Inc. v. Insurance Co. of North America:

> A number of courts have pointed out that the insurance contract in Union Insurance contained an express warranty of seaworthiness and express exclusion of loss caused by unseaworthiness or incompetence of the master. Thus the Court's announcement that an implied warranty of seaworthiness arises in a time hull policy at the time the policy attaches, and is complied with if the vessel is seaworthy at the time the policy attaches or, for defects occurring afterward, the defect did not result from the bad faith or negligence of the insured, is dicta. See Spot Pack, 242 F.2d at 388-89 n.3; New York, New Haven & Hartford Railroad v. Gray, 240 F.2d 460, 446 n.10 (2d Cir. 1957); New York & Puerto Rico Steamship Co., 204 F.2d at 258; see also G. Gilmore & C. Black, The Law of Admiralty, § 2-6, at 65 (2d ed. 1975) (expressing doubt that Supreme Court will uphold implied warranty). Despite these initial misgivings, the American rule appears to have become relatively well embedded in federal maritime law.

Id., 796 F.2d at 1036. Indeed, throughout the decision in L & L Marine Service, Inc. v.

15

Insurance Co. of North America, the Eighth Circuit states that there is an implied due diligence obligation for defects in seaworthiness which arise after the commencement of the risk. "'[A] defect of seaworthiness arising after the commencement of the risk, and permitted to continue from bad faith or want of ordinary prudence or diligence on the part of the insured or his agents, discharges the insurer from liability for any loss which is a consequence of such bad faith, or want of prudence or diligence.'" L & L Marine Service, Inc., 796 F.2d at 1036 (quoting Union Insurance Co. v. Smith, 124 U.S. 405, 427(1888)). The Court recognizes that the policy in L & L Marine Service, Inc. v. Insurance Co. of North America contained an express due diligence requirement, which the Court acknowledged and relied on in part. Id., 796 F.2d at 1036. Nevertheless, the Court finds the Eighth Circuit's support of an implied warranty of seaworthiness and its corollary implied due diligence obligation preclude entry of summary judgment in favor of Continental. Continental's motion is denied.

**B.     Continental's Motion for Partial Summary Judgment on Wreck Removal (ECF No. 97)**

At issue in this Motion is whether Starr must indemnify Continental for "costs or expense of, or incidental to, any attempted or actual removal or disposal of obstructions, wrecks or their cargoes under statutory power or otherwise pursuant to law" within the policies. Continental argues that the Corps' letters satisfy the requirement that wreck removal be "under statutory power or otherwise pursuant to law." On the June 22, 2011, Continental received a letter from the Corps stating, in pertinent part:

> This letter is a reminder that the sunken barge and the concrete content within the barge must be removed in its entirety from the Mississippi River as soon as safe working conditions and lower river elevations present the opportunity. The

removal of the barge and cement content is required under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act.   (ECF No. 13-3).

Likewise, in its August 4, 2011 letter, the Corps stated that "this barge requires removal."   (ECF No. 20-1).   The Corps went on to state, "Our goal at this time is simply to work collaboratively to ensure that this barge is removed.   If, however, we are unable to work collaboratively in this removal effort, we will have no alternative other than to take legal action to ensure environmental protection and navigation safety."   (Id.).

Continental asserts that wreck removal is covered because (1) well-established precedent holds that wreck removal is covered when vessel owners have a reasonable expectation of civil or criminal liability for failing to remove a wreck; and (2) the undisputed facts demonstrate that Continental has a reasonable expectation of civil or criminal liability for the sunken Mark Twain since the Corps repeatedly demanded removal and both the Coast Guard and the Corps have identified the Mark Twain as an obstruction to navigation on their public websites.   (ECF No. 98, p. 1).   Continental contends that "an order by a governmental authority is not necessary to demonstrate that a removal is compulsory by law."   Danos Marine Inc. v. Certain Primary Prot. & Indem. Underwriters, 613 F.3d 479, 484 (5th Cir. 2010).   The Fifth Circuit affirmed the district court's determination that "that removal is compulsory 'when a reasonable owner, fully informed, would conclude that failure to remove would likely expose him to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal.'" Danos Marine Inc., 613 F.3d at 483 (citing Cont'l Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1372 (5th Cir. 1983)); Progress Marine, Inc. v. Foremost Ins. Co., 642 F.2d 816 (5th Cir. 1981).   "Such

a duty must be present and unconditional, not remote and contingent." Cont'l Oil Co., 706 F.2d at 1373. Continental contends that the Corps' letters provide Continental with a reasonable expectation of criminal and/or civil liability. Alternatively, Continental asserts that the Corps' letters are the functional equivalents of governmental orders. Finally, Continental contends that the fact that the Mark Twain is located near the shoreline does not mean that the Corps cannot order its removal because the Corps' website states that the "removal of wrecks and other obstructions is the legal responsibility of the owner/operator/lessee for every sunken vessel in the U.S. navigable waters, bank-to-bank..." (ECF No. 98, p. 5).

Starr argues that the Mark Twain does not need to be removed because it is not in a navigable channel and it is not altering river conditions or obstructing navigation. Starr also contends that Continental has not shown that it is entitled to indemnity because it has not proven that it has paid any money for wreck removal.[1] (ECF No. 117, p. 2).

In addition, Starr maintains that Continental has failed to overcome Starr's affirmative defenses including (1) failure to exercise due diligence, (2) engaging in reckless, willful and wanton, and/or intentional conduct that caused the barge to sink, (3) failure to mitigate its damages by, in essence, challenging the alleged demand by the Corps to remove the barge, (4) engaging in collusive and/or bad faith conduct, (5) breaching its duty of utmost good faith, and (6) breaching its absolute warranty of seaworthiness at the inception of the Policy. (ECF No. 117, p. 3). Starr claims that Continental knew in 2008 that the barge was unseaworthy, but failed to make any repairs or notify Starr of this information when it applied for insurance. Starr asserts that the

---

[1]This point is moot because, since the filing of this motion, wreck removal has commenced and Continental has provided documentation outlining the wreck removal costs.

Mark Twain was taking on water three days before it sank, but that Continental employees failed to take basic steps to find or stop the leak. Starr complains that Continental hired a lobbyist to solicit a removal request from the Corps and never challenged that ruling. Finally, Starr states that Continental failed to remove the Mark Twain during record low river levels that would have allowed it to remove the wreck for less than half the estimated cost.

Finally, Starr asserts that wreck removal is not under statutory power or otherwise pursuant to law. Starr claims that a government order is needed for removal to be compelled by law. See ECF No. 117, p. 5 (citing Seaboard Shipping Corp. v. Jocharanne Tugboat Corp., 461 F.2d 500, 504 (2d Cir. 1972)(referencing a "government order"); Paul K. Riermaier, Compulsory Discord-the Second, Third, and Fifth Circuits Still Interpret the Term "Compulsory by Law" in Protection and Indemnity Policies Differently: Danos Marine, Inc. v. Certain Primary Protection & Indemnity Underwr, 35 Tul. Mar. L.J. 645, 654 (2011)("This clear-cut standard should remove ambiguity and risk from parties removing wrecks under the Second Circuit scheme."). Starr claims that there is no governmental order or legal obligation requiring wreck removal. (ECF No. 117, pp. 5-13).

The Court finds that Continental has demonstrated that it is entitled to indemnity for wreck removal under the terms of the policy and under well-established Fifth Circuit precedent. The Court finds that a reasonable owner, fully informed, would conclude that failure to remove would likely expose the owner to liability imposed by law based upon the language in the Corps' letters, particularly the Corps' warning that it "will have no alternative other than to take legal action to ensure environmental protection and navigation safety" if the barge is not removed. The Court is

19

not persuaded by the legal authority cited by Starr that a governmental order is required, particularly given that it consists of a Second Circuit case from 1972 and a student law review article.

Nevertheless, the Court denies summary judgment because Starr has asserted several defenses that are still the subject of factual disputes.   First, Starr contends that Continental violated doctrine of *uberrimae fidelis*.   As discussed herein, Starr maintains that Continental failed to disclose a 2008 survey as part of its application for insurance, which presents an issue of material fact regarding whether the policies are void.   In addition, the Court finds that the due diligence requirement applies to the wreck removal policy and that defense remains available to Starr.   Finally, the Court believes that an issue of fact exists regarding whether Continental failed to mitigate its damages by removing the barge when rivers were low.   See Alcoa S. S. Co. v. Charles Ferran & Co., 251 F. Supp. 823, 832 (E.D. La. 1966)("'Public policy requires that persons should be discouraged from wasting their resources both physical or economic.'").   Because the Court believes issues of fact exist regarding these defenses, the Court denies summary judgment on wreck removal.

The Court, however, finds that the defense that Continental failed to mitigate its damages by challenging the wreck removal demand by the Corps fails.   Starr does not cite to the basis of this purported requirement and Continental points out that neither the insuring agreement, nor the law, state that a vessel owner must challenge the Corps before it can be covered for wreck removal. Likewise, Starr's claim that Continental engaged in collusive or bad faith conduct does not provide a valid defense.   As discussed herein, the Court finds that the Corps' letters are admissible and

were properly attained.   The Court does not believe that Continental did anything untoward and finds Starr's allegations of such to be pure speculation.

**C.   Continental's Motion for Partial Summary Judgment on Starr's Contention and Affirmative Defense that the Policies are Void (ECF No. 99)**

On November 4, 2010, Continental applied to Starr for insurance for Continental's five barges that carry cement on the Mississippi River between Continental's cement plant in Hannibal, Missouri and its terminal in St. Louis.   (ECF No. 100, p. 2).   The application form, which Starr provided for Summitt's broker to complete, stated "Quotes are subject to satisfactory condition and valuation surveys" and asked the applicants to "Please include recent surveys, if available." (ECF No. 100, p. 3).   Continental referred to the most recent condition and valuation survey for four of the barges, including the Mark Twain, which had been prepared in 2006 by Merrill Marine Surveyors.   (ECF No. 100, p. 4).[2]   Continental told Starr that the barges "obviously" were due for new surveys.   (Id.).

Continental, however, did not mention a 2008 general conditions survey performed on the Mark Twain by the Manley Brothers, Starr's experts in this lawsuit.   (ECF No. 100, p. 4).   The 2008 survey did not address the Mark Twain's value or worth, but instead dealt with whether the Mark Twain was suitable for conversion to a dock barge.   (Id.).   The 2008 survey identified flows in the roughly 80-year old Mark Twain, including certain rivets that showed signs of prior leaks and an original design that did not include all watertight bulkheads, but also states that there are "no active leaks" and "no areas requiring immediate repairs."   (Id.).

---

[2]A condition and valuation survey, also called a condition and value survey, is a specific type of marine survey which addresses both the condition of the vessel and its value or worth.   (ECF No. 100, p. 3).

The insurance application was received on November 5, 2010, and Starr agreed to bind coverage on December 31, 2010. (ECF No. 100, p. 5). Starr did not survey any of the barges prior to issuing the policies or prior to the sinking of the Mark Twain on February 7, 2011. (Id.). Manley Brothers, Starr's experts, participated on Starr's behalf in the investigation of the sinking and proposed recovery of the barge. (ECF No. 100, p. 6).

On May 9, 2011, Starr declined coverage for the loss of the Mark Twain and filed this lawsuit alleging that it owes no obligation to Continental with regard to the sinking. (ECF No. 100, p. 6). Starr's declination letter did not mention any concealment of any information, including the 2008 study, as a ground for declining coverage. (Id.). Likewise, Starr's initial complaint did not mention concealment as a ground for declining coverage. (Id.). On August 14, 2012, Starr filed its Fourth Amended Complaint which contended that the insurance policies are void because the 2008 study was not mentioned in the application and was material to Starr's decision to underwrite the risk.

Continental notes that it paid premiums totaling approximately $50,000.00 for the primary and excess insurance that Starr sold. (ECF No. 100, pp. 6-7). Continental claims that Starr has not returned the premium dollars for the policies that Starr claims are void. (ECF No. 100, p. 7).

Starr contends that it was permitted to void the policies because Continental did not disclose the 2008 study, thereby violating the doctrine of *uberrimae fidei*. "Insurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." Stipcich v. Metro. Life Ins. Co., 277 U.S. 311, 316 (1928).

1.     *Uberrimae Fidei*

"State law ... governs the interpretation of marine insurance policies unless an available federal maritime rule controls the disputed issue." Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 886 (5th Cir. 1991).   In Albany Ins. Co. v. Anh Thi Kieu, the Fifth Circuit identified three factors that a court should consider in determining if a federal maritime rule controls the disputed issue: (1) whether the federal maritime rule constitutes "entrenched federal precedent;" (2) whether the state has a substantial and legitimate interest in the application of its law; (3) whether the state's rule is materially different from the federal maritime rule.   Id.   Ultimately, the Fifth Circuit held that all three factors favored the application of state law, including that the "*uberrimae fidei* doctrine is entrenched no more."   Id. at 890.   Based upon this precedent, Continental contends that the Court should not apply the doctrine of *uberrimae fidelis* to the instant case and instead should apply Missouri state law.   Continental asserts that the defense that Continental breached the duty of *uberrimae fidelis* is unavailable to Starr because the duty of utmost fidelity is not recognized by the Eighth Circuit in maritime insurance cases.   Likewise, the Fifth Circuit does not recognize the doctrine.

In response Starr asserts that the doctrine of *uberrimae fidelis* remains entrenched federal precedent and that the ruling in Anh Thi Kieu was an aberration.   (ECF No. 116, pp. 3-8).   Starr cites cases from the Second Circuit, Third Circuit, Ninth Circuit, Eleventh Circuit, the District Court of Massachusetts, and the Northern District of Illinois that have all affirmed the doctrine of *uberrimae fidelis* post-Ahn Thi Kieu.   Starr also maintains that the Eighth Circuit has not rejected the *uberrimae fidei* doctrine, finding that the doctrine is in accordance with general contract and

insurance law principles.   (ECF No. 116, p. 8); Shipley v. Arkansas Blue Cross & Blue Shield, 333 F.3d 898, 903 (8th Cir. 2003)(citing cases); Stipcich v. Metro. Life Ins. Co., 277 U.S. 311, 316, 48 S.Ct. 512, 72 L.Ed. 895 (1928) ("Insurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option.").

Starr contends in the Fourth Amended Complaint that the policies are void because Continental did not disclose in its application for insurance a 2008 feasibility study that showed flaws in the Mark Twain.   Starr notes that the study described the lack of watertight compartments, lack of a functioning bilge pump, thin hull gauging and pittting and rivets throughout that appeared to be leaking.   (ECF No. 116, pp. 10-11).   Starr's underwriter, Lincoln Purdy, testified that he would not have insured the barge under the same policy terms and conditions if the study had been disclosed.   (ECF No. 116, p. 11).   Starr claims that this violates Continental's duty of *uberrimae fidelis*.

The Court finds that the duty of *uberrimae fidelis* remains entrenched federal precedent and that Starr can assert the defense that Continental violated the duty of good faith.   It appears that only the Fifth Circuit has found that the duty of *uberrimae fidelis* is no longer entrenched federal precedent, and that most other circuits still recognize this duty.   Moreover, the Eighth Circuit appears to recognize this duty, although not specifically discussed in the maritime context. Shipley, 333 F.3d at 903.   Based upon the foregoing, the Court finds that Continental owed Starr the duty of *uberrimae fidelis*.

Having found that the duty of *uberrimae fidelis* remains entrenched federal precedent, the

issue remains whether Continental violated said duty.  Starr asserts that if the 2008 survey had been disclosed, then it would have issued the policies under different terms.  In response, Continental claims that Starr's assertion that the 2008 survey would have been material is implausible given that Starr issued the policies knowing that the Mark Twain was very old and without any inspection and even though Continental told Starr that the barges, including the Mark Twain, were due for inspections.

The Court denies summary judgment to Continental because the Court believes issues of fact exist regarding whether the Continental violated duty of utmost good faith.  Although Starr chose not to pursue additional inspections or investigation of the Mark Twain based upon the information that Continental provided, the Court cannot state as a matter of law that Starr would not have taken further action if it had been provided the 2008 survey.  This remains a question of fact for the fact finder.

### 2.    Waiver

In the alternative, assuming that there is no entrenched federal precedent and state law applies, Continental claims that Starr has waived any argument that its policies are void because Continental did not mention the 2008 study of the Mark Twain in the insurance application. Continental claims that Starr waived this defense because it failed to return the $50,000.00 in premium dollars.  (ECF No. 100, p. 7).  Continental asserts that Starr cannot claim that the policies are void while still retaining the benefit of the bargain, the premiums.  Continental maintains that under Missouri law, "[t]he rule appears to be established in this state that, if an insurance company or bonding company desires to place itself in a position to make the defense

that the policy or bond was not in force and effect from the beginning, it is its duty to tender back to assured the premiums paid by him within a reasonable time after the discovery of the facts upon which it intends to base such defense." Goffe v. Nat'l Sur. Co., 9 S.W.2d 929, 933 (Mo. 1928); Lux v. Milwaukee Mechanics' Ins. Co., 30 S.W.2d 1090, 1093 (Mo. Ct. App. 1930)("[D]efendant never tendered back the premium paid for the policy, but at all times retained said premium. This it is not permitted to do without waiving such alleged defense. Such action, of itself, is evidence of lack of good faith on the part of the insurer in contesting a suit."); ECF No. 100, pp. 7-8.

Starr claims that it is ready to return the policy premium to Continental upon this Court's determination of Continental's violation of the utmost good faith doctrine. (ECF No. 116, p. 13). Starr asserts that the Goffe and Lux cases are inapplicable because those cases did not involve declaratory judgment actions. (ECF No. 116, pp. 12-13)(citing Great Lakes Reinsurance PLC v. Barrios, 08-20281-CIV-UNGARO, 2008 WL 6032919 (S.D. Fla. Dec. 10, 2008); Am. Home Assur. Co. v. Masters' Ships Mgmt. S.A., 423 F. Supp. 2d 193 (S.D.N.Y. 2006)). Rather, the policies in Goeffe and Lux were voided due to a lack of an insurable interest, which is not the argument here. Starr points out that "[i]n the absence of a statute, an insurance company is not required to return or tender back the premiums received as a condition precedent to bringing a suit in equity to cancel a policy on the ground of fraud, though the court may require such tender as a condition to the entry of its decree. Nor is a deposit in court of the premiums paid a condition precedent to maintaining the suit." Reliable Life Ins. Co. v. Bell, 246 S.W.2d 371, 375 (Mo. Ct. App. 1952). Moreover, Starr asserts that it did not intentionally waive its right to void the policy by accepting Continental's premiums because it did not know of the 2008 study when it filed this

declaratory judgment action.   (ECF No. 116, pp. 13-15).

The Court finds that Starr has not waived its argument that the policies were void because it has retained Continental's premiums.   The Court notes that Starr stands ready, willing and able to return the premiums upon a favorable determination from this Court.   Moreover, the Court finds that Missouri precedent does not require returning the premiums prior to maintaining a suit for declaratory judgment.   See Reliable Life Ins. Co. v. Bell, 246 S.W.2d at 375.   Therefore, the Court finds that Continental is not entitled to summary judgment on the basis of waiver of this argument.

### 3.    Fraud

Continental also claims that it is entitled to summary judgment because, to the extent that Missouri law applies, Starr would have to prove fraud, which has not been pled.   See Cont'l Cas. Co. v. Maxwell, 799 S.W.2d 882, 888 (Mo. Ct. App. 1990)("To prove a fraudulent misrepresentation the insurer must demonstrate, among other things, that the insured knowingly made a false statement with the intent to deceive the insurance company."); Anh Thi Kieu, 927 F.2d at 886 (assuming that there is no entrenched federal precedent, the Court looks to state law for the governing rule absent a federal maritime rule controlling the disputed issue). Continental claims that it was not required to provide the 2008 survey and that Starr cannot demonstrate that anything in Continental's insurance application was erroneous.

The Court finds that, even if federal maritime law does not apply in this instance, Continental is nevertheless not entitled to summary judgment because issues of material fact exist regarding whether there has been a material misrepresentation.   The Court believes that an issue

of fact exists regarding whether Continental's failure to provide the 2008 survey constitutes a material omission. Starr's broker specifically stated that the terms of the insurance coverage would have been different had Continental disclosed the 2008 survey. See Crewse v. Shelter Mut. Ins. Co., 706 S.W.2d 35, 39 (Mo. Ct. App. 1985)("misrepresentation is material if it would likely affect the conduct of a reasonable man with respect to his transaction with another."). While evidence in the record exists to contradict this claim, the Court finds that it presents an issue of fact for a jury. See Cent. Bank of Lake of the Ozarks v. First Marine Ins. Co., 975 S.W.2d 222, 225 (Mo. Ct. App. 1998)("A misrepresentation of fact is deemed material if the fact, stated truthfully, might reasonably have influenced the insurance company to accept or reject the risk or to have charged a different premium."). Accordingly, the Court denies Continental's Motion for Summary Judgment on this basis.

### D. Plaintiffs' Motion to Exclude Corps' Witnesses & Letters (ECF No. 104)

In Starr's motion, it seeks to exclude expert testimony from the Corps' Project Manager Charles Frerker and Assistant District Counsel Beth Pitrolo and to exclude letters that Mr. Frerker and Ms. Pitrolo prepared and signed on behalf of the Department of the Army regarding the status and removal of the Mark Twain.

Starr moves to exclude two letters written by Corps employees, Charles Frerker and Elizabeth Pitrolo. Starr notes that the letters do not set forth factual findings made by the Corps concerning the barge, but are merely conclusory statements of two agency employees without any investigation. Starr also contends that the letters are based solely upon information provided by Continental's consultant, Lee McKinney. Finally, Starr asserts that the letters are not a final

agency determination.

Starr argues that the admission of expert testimony is prejudicial because the witnesses were not disclosed under Rule 26(a)(2) and, even if they had been disclosed, any opinions expressed by the witnesses would not meet the relevance and reliability requirements of Fed.R.Evid. 702 and <u>Daubert</u>. Moreover, any opinions expressed by the witnesses would not meet the requirements of Fed.R.Evid. 701 because opinions by lay witnesses must be based on first-hand knowledge and not on specialized knowledge within the scope of Fed.R.Evid. 702.

Finally, Starr contends that the letters should be excluded from evidence because they are hearsay without an exception in that they do not fit within the Fed.R.Evid. 803(8) "public records exception." Starr claims that the letters are not based upon the firsthand knowledge of Mr. Frerker and Ms. Pitrolo, who never actually investigated the Mark Twain. In addition, Starr asserts that the letters are untrustworthy under Rule 803(8)(c) because Continental's expert manipulated the Corps' employees into providing these letters.

In response, Continental contends that Starr's <u>Daubert</u> argument is misplaced. Continental notes that Mr. Frerker and Ms. Pitrolo are fact witnesses and, therefore, <u>Daubert</u> is inapplicable. Continental states that it appropriately disclosed Mr. Frerker and Ms. Pitrolo as fact witnesses with first-hand knowledge of the correspondence regarding removal of the Mark Twain. (ECF No. 112, p. 1).

Further, Continental contends that the letters should not be excluded because they fall into one or more of the hearsay exceptions. Continental asserts that the Corps' letters are not offered for the truth of the matter asserted because the letters are only being utilized to demonstrate the

effect that they would have on a reasonable barge owner regarding whether wreck removal was required.

Continental also takes issue with Starr's claim that Continental "actively solicited" the letters from the Corps. Continental notes that Starr instructed Continental that it required "a governmental order mandating removal of the wreck or declaration as an obstruction to navigation" to trigger indemnity under the P&I policy. Continental hired a consultant, Lee McKinney, to facilitate the process of obtaining an order with the Corps. Continental then received the first letter from Mr. Frerker. Thereafter, Starr directly contacted the Corps, who responded with the second correspondence from Ms. Pitrolo.

The Court finds that Mr. Frerker and Ms. Pitrolo were properly disclosed as fact witnesses. They have first-hand knowledge about the Corps' letters sent to Continental and to Starr regarding the Mark Twain. They can testify regarding their participation in the process and their observations of events. Any concerns that Starr has regarding their purported lack of first-hand knowledge regarding the condition of the Mark Twain can be addressed during cross-examination.

The Court also holds that the June 22, 2011 and August 4, 2011 letters by Mr. Frerker and Ms. Pitrolo fall within one or more hearsay exceptions. First, the Court agrees that the letters are not presented for the truth of the matter asserted. Rather, they are utilized by Continental to demonstrate the reasonableness of its belief that it was required to remove the barge. See Bady v. Murphy-Kjos, 628 F.3d 1000, 1003 (8th Cir. 2011) ("A common type of statement that falls outside the hearsay definition, because it is not offered for its truth, is a statement that is offered to show its effect on the recipient."); Barrett v. Acevedo, 169 F.3d 1155, 1163 (8th Cir.1999).

In the alternative, the Court finds that the letters fit within the public records exception. Under Fed.R.Evid. 803, a record or statement of a public office if:

(A) it sets out:

(i) the office's activities;

(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

(iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Here, the letters set out the office's activities regarding the need to remove the Mark Twain, thus satisfying Fed.R.Evid. 803(A)(i). The letters also present the factual findings from a legally authorized investigation in accordance with Fed.R.Evid. 803(A)(iii). The letters provide the Corps' determinations that (1) the concrete material in the sunken barge is considered fill material, which is unauthorized, (2) the barge will alter river currents, change sediment deposition and scouring patters and present potential future risks for safe navigation, (3) the barge is in a location that may create potentially hazardous current, (4) the barge is located in close proximity to the location of a new Mississippi River bridge currently under construction, and (5) the barge will induce scouring, deposition and bed load transfer patterns that will affect the Mississippi River and will possibly impact bridge footings. (ECF Nos. 104-2, 104-5). The Court believes that the Corps had sufficient information to make these determinations. If Starr challenges the Corps'

investigation and the reasonableness of these determinations, then such issues can be addressed during cross-examination.

Finally, the Court finds that Mr. Frerker and Ms. Pitrolo's testimony and letters have not been manipulated and are not tainted. Although Starr goes to great lengths to assert that Continental orchestrated this correspondence with the Corps, the Court finds nothing untoward. Continental approached the Corps solely at Starr's direction. Moreover, the Court does not believe that the use of a consultant, such as Mr. McKinney, was improper. It appears to be standard practice within the industry and Starr's own expert, Mr. Manley, has admitted to performing similar work. Accordingly, Starr's Motion to Exclude is denied.

### E. Starr's Motion for Partial Summary Judgment (ECF No. 107)

Starr argues that it is entitled to summary judgment on Continental's vexatious refusal to pay claim. Starr claims that it is entitled to summary judgment because Starr has a right to litigate open questions of law and insist upon a judicial determination of its coverage without penalty.

Starr identifies several items that are in dispute with regards to both the hull and the P&I claims, which Starr asserts preclude a finding of vexatious refusal to pay. Starr notes that the cause of the sinking of the barge under the hull claim is disputed (ECF No. 128, pp. 2-3) and the need for wreck removal under the P&I claim is disputed (ECF No. 128, p. 3). Starr identifies the following specific coverage issues in dispute: (1) the barge sank as a result of a known leak, rather than a covered peril; (2) no government order requires that Continental remove the barge; (3) Continental's recklessness in allowing the barge to sink is outside the coverage of both the hull and the P&I policy; (4) Continental breached its absolute warranty of seaworthiness at the inception of the policy; (5) Continental breached its implied warranty of seaworthiness following the inception of the risk; and (6) Continental breached its duty of utmost good faith in failing to provide Starr

with material information reflecting deteriorated conditions of the barge. (ECF No. 108, pp. 4-5).

Starr also claims that it conducted a sufficient investigation of the hull claim (ECF No. 128, pp. 4-6). Starr maintains that because the Mark Twain sank in calm waters, this raised a presumption of unseaworthiness. Starr claims that once the presumption of unseaworthiness arose, the burden shifted to Continental to show that the barge was seaworthy prior to its sinking and to prove loss by a peril named in the policy. (ECF No. 128, p. 4 (citing <u>Commercial Union Ins. Co. of New York v. Daniels</u>, 343 F. Supp. 674, 677 (S.D. Tex. 1972)). Starr claims that Continental failed to provide Starr's agents with information relevant to the Mark Twain's sinking or its theory of what caused the loss. (ECF No. 128, pp. 4-5). Starr, therefore, claims that it should be allowed to question the loss without penalty.

Similarly, Starr claims that it conducted a sufficient investigation of the P&I claim. (ECF No. 128, pp. 6-9). Starr asserts that it did not act vexatiously in refusing coverage because, at the time it declined coverage, Continental had not provided any evidence of any communications with any governmental entity or evidence of any governmental involvement. (ECF No. 128, pp. 6-7). Starr also questions the admissibility and interpretation of the Corps' letters regarding the removal of the Mark Twain. (ECF No. 128, pp. 7-10).[3]

Finally, Starr claims that it did not have a vexatious or recalcitrant attitude regarding the investigation. (ECF No. 128, pp. 10-11). Instead, Starr claims it is entitled to a judicial determination of its liability in good faith based upon the parties' honest differences of opinion and interpretation of law.

In response, Continental contends that the mere fact that triable issues exist does not

---

[3]As discussed herein, the Court finds that Starr's concerns regarding the Corps' letters are unfounded.

insulate Starr from liability for vexatious refusal to pay.   (ECF No. 115, p. 2).   "The existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." <u>DeWitt v. Am. Family Mut. Ins. Co.</u>, 667 S.W.2d 700, 710 (Mo. 1984)(citing <u>Still v. Travelers Indemnity Co.</u>, 374 S.W.2d 95, 103 (Mo.1963); <u>Kimpton v. Spellman</u>, 173 S.W.2d 886, 893 (Mo. 1943); <u>Berry v. Federal Kemper Insurance Co.</u>, 621 S.W.2d 948, 953–54 (Mo. Ct. App.1981)). "Direct and specific evidence to show vexatious refusal is not required, the jury may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case."   <u>DeWitt</u>, 667 S.W.2d at 710 (citing <u>Evans v. Great Northern Life Insurance Co.</u>, 167 S.W.2d 118, 125 (Mo. 1942)).

Continental first claims that Starr acted vexatiously by renouncing the validity of the insurance contracts while also keeping all of the premium dollars.   (ECF No. 115, pp. 2-4).   The Court, however, has already addressed this issue and found that Starr stands ready, willing and able to return the premiums. Therefore, this cannot constitute a basis for a finding of vexatious refusal to pay.

In addition, Continental maintains that evidence of Starr's inadequate investigation before declining coverage creates a triable issue of fact regarding Starr's vexatious refusal to pay.   (ECF No. 115, pp. 4-10).

Finally, Continental contends that additional actions taken by Starr demonstrate its recalcitrance in handling and declining Continental's claims.   (ECF No. 115, p. 11).   For example, Starr's declination letter and its brief both state that Starr was declining coverage because Continental failed to identify a covered peril.   (ECF No. 115, p. 11 (citing ECF No. 1-4, p. 2; ECF No. 108, p. 5).   Continental asserts that the policy does not require it to declare a peril and that this

Circuit does not require an insured to prove the exact nature of the casualty. (ECF No. 115, p. 11) (citing Gibbar v. Calvert Fire Ins. Co., 623 F.2d 41, 45 (8th Cir. 1980)(the insureds "were not bound to go further and prove the exact nature of the accident or casualty which in fact occasioned this loss"). Moreover, Continental maintains that Starr knew before it declined coverage that the "particular peril" that "might arguably cover this loss" was ice. (ECF No. 115, p. 11).

In addition, Continental asserts that Starr's position is at direct odds with the deposition of Paul Ferguson, Starr's Vice President of Claims, who also approved Starr's declination letter. Mr. Ferguson conceded during his deposition that the Corps' letter demanded that Continental remove the barge and that doing so was not optional. (ECF No. 115, p. 12). Therefore, Continental claims it was vexatious for Starr not to provide wreck removal coverage. Mr. Ferguson also admitted that the declination letter never mentions lack of due diligence as a basis for declining the wreck removal claim and contends that due diligence exclusion applies even though the Continental contends that the policy language does not apply to wreck removal. (ECF No. 115, p. 12-13).

Continental also claims that Starr cannot take the contrary position in support of its summary judgment that "serious questions remain about why the barge sank" (ECF No. 108, p. 4) when it declined coverage for the hull claim because "the loss appears to have been due to a lack of due diligence by the assureds." (ECF No. 1-4, p. 2). Continental claims that the two positions are incompatible and further demonstrate the existence of at least a genuine issue of material fact regarding whether Starr breached its insurance contracts and vexatiously refused to pay covered claims. (ECF No. 115, p. 13).

As discussed throughout this Order, major issues of fact exist in this case that preclude summary judgment. However, the Court finds that these triable issues exist do not insulate Starr

from potential liability for vexatious refusal to pay. The Court finds that if a jury believes Continental's version of the events, then it could find that Starr vexatiously breached the insurance contracts. Without reviewing the entire record, the Court notes that Continental has identified several facts in the evidence that could point to bad faith on Starr's part. <u>Crewse v. Shelter Mut. Ins. Co.</u>, 706 S.W.2d 35, 41 (Mo. Ct. App. 1985). For example, if the jury believes that Starr knew that Continental was asserting that the claimed peril was ice and that Starr declined coverage prior to a full investigation, then a jury likewise could find that Starr vexatiously refused to pay for hull coverage. Likewise, if a jury could also find that Starr acted vexatiously by failing to properly investigate or consult the Corps prior to declining coverage for wreck removal. In sum, the jury could determine based upon consideration of the whole testimony and all the facts and circumstances in connection with the case that Starr acted vexatiously in declining coverage. Thus, the Court cannot find in favor of Starr as a matter of law and denies its Motion for Summary Judgment on vexatious refusal on that basis.

Accordingly,

**IT IS HEREBY ORDERED** that Continental Cement Company, L.L.C. and Summit Materials, L.L.C.'s Motion to Exclude Expert Opinions and Computer-Based Modeling of William Manley [101] and Continental's <u>Daubert</u> Motion to Exclude Tom Rollins [109] are **DENIED**, in part, and **GRANTED**, in part, as discussed herein.

**IT IS FURTHER ORDERED** that Starr Indemnity & Liability Company and New York Marine & General Insurance Company's <u>Daubert</u> Motion to Exclude John Tylawsky [103] is **DENIED**.

**IT IS FURTHER ORDERED** that Continental's Motion for Partial Summary Judgment that "Due Diligence" is Not a Defense to Coverage Under the Perils Clause of the Hull Policy [87],

Motion for Partial Summary Judgment on Wreck Removal [97], Motion for Partial Summary Judgment on Starr's Contention and Affirmative Defenses that the Policies are Void [99] are **DENIED**.

**IT IS FINALLY ORDERED** that Starr's Motion for Partial Summary Judgment [107] and Starr's Motion to Exclude Corps' Witnesses and Letter [104] are **DENIED**. Continental shall provide Starr with Continental's redacted attorneys' fees invoices within three (3) days.

Dated this 9th day of April, 2013.

_____

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE